OAKLAND ICE COMPANY *vs.* SANFORD N. MAXCY and another.

Kennebec. Opinion January 23, 1883.

*Evidence. Contract.*

Conversation between the parties to a written contract, after it has been executed and delivered, relating to a change of some of its provisions, is admissible in evidence.

So, also, would messages sent by a third party and shown to have been communicated to the other party, when relating to a change in the contract. The order in which the facts shall be marshaled, which show the sending and delivery of the message, is subject to the discretion of the court.

Conversation between the parties as to certain terms to be inserted in a written contract, is admissible in evidence when the opposite party on cross examination draws out a part of that conversation.

ON EXCEPTIONS AND REPORT from the superior court.

Assumpsit for cause stated in the opening of the opinion. The writ was dated May 20, 1881. Plea, general issue with brief statement.

The following are the exceptions, and so much of the evidence and charge, as are referred to in the exceptions.

To the following rulings, admissions of testimony against the objection of defendants' counsel, instructions and refusual to instruct, the defendants except.

"1. To the admission of the testimony of A. Rich on page seven of the report, as to what Maxcy said, commencing with the sentence 'I called Maxcy's attention to the fact,' and ending with the words 'and re-covering again.'

"2. To the admission of Rich's statement on pages eight and nine as to what message he sent by Davenport to the defendants and what Davenport told him that Maxey said in reply. (This testimony was admitted on the statement by counsel that the message would be shown to have been communicated to the defendants.)

"3. To the admission of Rich's testimony on pages twenty and twenty-one relating to a pretended conversation with Maxcy as to the time of shipping the ice and as to how the clause 'In the month of August' came to be inserted in the contract.

"4. To the answer of Rich to the question by his counsel, 'How long a notice would you have required to open your houses and deliver five hundred tons of ice according to this contract and be ready to ship,' as appears on pages twenty-one and twenty-two.

"5. To that part of the charge of the judge on page sixty of the charge, commencing with the sentence, 'And I may here with respect to what constitutes a waiver of the terms in that contract,' and ending with the words and sentence, 'You have a right to infer the assent or the acquiescence of a party to a proposition from the language and his conduct and all the circumstances attending the occurance at the time. It is purely a matter of fact for the determination of the jury.'

"6. To the language of the judge on page sixty-three of the charge, beginning with, 'It was the duty of defendants,' and ending with the sentence, 'In order that it might be loaded.'

"7. To the language of the judge, page sixty-seven of the charge, beginning with the sentence, 'I have already said it is not necessary' and ending with the words, 'Then the parties are estopped.'

"8. To the charge of the judge as to the rule of damages on pages sixty-eight and sixty-nine of the charge.

"9. To the instruction suggested and repeated by the plaintiffs' counsel at the close of the charge and allowed by the judge on page seventy-one of the charge."

Defendants' counsel requested the judge, to give the following instructions :

"1. That under this contract it was the duty of the plaintiffs to notify the defendants when they opened their houses and commenced shipping.

"2. That if the defendants were notified about the twenty-fifth of August, as stated by Maxcy, that the plaintiffs were not going to open their houses in August, it was a violation of the contract on the part of the plaintiffs and defendants were exonerated from taking the ice under the contract after that.

"3. That if the jury find that Maxcy called on Davenport and inquired when they were going to open the Oakland houses and told him that he had vessels in the river ready to place there any time as testified to by Maxcy, that was a sufficient demand and all that was required by defendants. Said requested instructions were refused except as appears in the charge.

"To which rulings, instructions and refusal to instruct the defendants except, and pray that their exceptions may be allowed."

*Testimony of Abram Rich.* "I called Maxcy's attention to the fact that it would be inconvenient for the Oakland Ice Company to open the ice houses to ship one cargo of ice. Mr. Maxcy's reply was, 'Well, you will be shipping ice at your place, and have shipped some ice there for the Oakland Ice Company. You could put the cargo in from there if you were not shipping at the Oakland Ice Company's buildings.' This was after the contract was drawn up, signed and delivered, and before we separated. Maxcy said he was a stockholder in the Oakland Ice Company and of course would want to make it as convenient as possible for the company to ship ; would not want to cause any loss by opening for the purpose of one cargo, and re-covering again." . . .

"*Question.* You may state what directions you gave to Mr. Davenport, the treasurer, to be communicated to these defendants in reference to this contract, and when it was? (Objected to and admitted.) *Answer.* It was in the latter part of August, I think between the twenty-fifth and twenty-seventh, 1880. I instructed Mr. Davenport to see Sanford Maxcy and say to him from me that if he particularly desired that five hundred tons of ice in the month of August, to put a vessel at my place at Farmingdale and I would ship it there on account of the Oakland Ice Company if the Oakland Company were not shipping from their houses below; but if that would not do that we would open the Oakland Ice Company's houses and give it to him from there. I also told Davenport that I was going to put a crew down to ship the ice out from the Oaklands as soon as they finished a room that they were then at work on in my houses in Farmingdale. And they would probably get at work on the first day of September, which they did do. I directed him also to communicate that to Mr. Maxcy. I think I have now stated all the directions I gave to Mr. Davenport. The next day Mr. Davenport brought me the answer of Mr. Maxcy to my message. Davenport said he had communicated my message to Mr. Maxcy, and Maxcy said that was all right; that as they had held off to accommodate us they should expect that we should hold off a little while to accommodate them and let them have a little more time in which to take the ice, and that he (Davenport) had told Mr. Maxcy that we undoubtedly should do so. And I assented to it when he told me. Davenport said that Maxcy thought it was hardly worth while to open the Oakland houses for one cargo of ice; it was not a very material point with him." . .

"*Question.* You were asked by the counsel as to the clause of 'in the month of August,' and as to when the company were shipping ice. You may state all that was said on that subject, and how the clause was inserted. (Objected to and admitted.) *Answer.* When those contracts were being written there was some little talk over the time of shipment, and Maxcy wished to make it convenient for the Oakland Ice Company, and said he could take the ice most any time when the company were ship-

ping; a few days would make no particular difference, and asked me when I thought I would be taking the ice out there. I told him I anticipated shipping from there some time in the latter part of August. When I could spare one crew from Farmingdale I should put it down there and take the ice off, empty the houses. And he said a few days' time would make no difference to him, even if it was a little later than August. I am giving his language as near as I can recollect. Maxcy stated that he was a stockholder in the Oakland Ice Company and he wished to make it convenient for the company in taking the ice. That was the substance of the talk."    .    .    .

*Question.* If any time during the month of August you had been requested to open your houses and deliver the five hundred tons of ice according to the contract, how long a notice would you have required to open your houses and be ready to ship? *Answer.* If the crew were there I should think some where from half an hour to an hour's time. (Answer objected to and admitted.) It would have required that time to open the houses and be ready to run the ice. I could have had a crew there within quarter or half a day after notice or request.

*Charge of the presiding judge.*    .    .    .    "And I may say here with respect to what constitutes a waiver of the terms in that contract, as in all other cases of contracts, it is not indispensable that this alteration, this change, or this waiver, should be in *express* terms. You have a right to infer the assent or the acquiescence of a party to a proposition, from his language and his conduct, and all the circumstances attending the occurrence at the time. It is purely a matter of fact for the determination of the jury."    .    .    .

"Now, there is evidence here to which, perhaps at this point, it is my duty to call your attention, which should be considered in connection with the terms of this contract. There is evidence here, about which there is no controversy, that in the ice business on the Kennebec river it is the uniform and universal custom for the purchaser to furnish the vessel and give notice that the vessel is ready at a given time to receive the ice; that it is the duty of the seller to load the ice at his own expense on board of the

ship upon the notice which he has thus received. It is not in controversy that this custom has been of sufficiently long standing that it may be presumed to have been known to parties engaged in any transactions of this character. No controversy is raised upon that point, therefore you have a right to consider this contract in connection with this uniform universal custom. That is, it was the duty of the plaintiffs here to load this ice on shipboard in Pittston at the Oakland houses." . . .

"It was the duty of the defendants to notify the plaintiffs of their readiness to receive it on shipboard, notify them when the ship would be there, and request them to load accordingly. For, you will perceive that in case of a commodity of the peculiar character of ice it would not be reasonable to require the plaintiffs to keep their houses open during the whole month of August, waiting and hoping that some day the defendants' vessel would come along, in order that it might be loaded." . .

"I have already said it is not necessary that there should be express terms, express language to indicate a waiver by which parties may be bound. If the proposition is made on one side and silently acquiesced in, if from the circumstances and the conduct of the parties you are satisfied that they acquiesced in it, that would be a waiver. Or if the defendants by any conduct or language of theirs fairly authorized the plaintiffs regarded as men of average prudence, caution and discretion, to believe that they had waived this provision of the contract in respect to the place of delivery, and the plaintiffs did believe it, and did act upon it, and did not open their houses, relying upon it, the defendants would be bound by that language and conduct which caused the plaintiffs to act upon it, precisely as though there had been in fact a mutual agreement. That is on the principle of estoppel, and it is a principle of justice and fairness. If they have by their language or their conduct, which would have caused any prudent men to believe a certain thing, induced them to act upon it, and they did believe it and act upon it the parties are estopped." . . .

*Mr. Baker.* "I would request the instruction that it is competent for the jury to consider the instructions given by

Capt. Rich to Mr. Davenport as bearing upon the question of the probabilities of what the message really was that was communicated."

*The Court.* "Certainly. That is all a question of fact for you, gentlemen. You have a right to consider the evidence."

Other material facts stated in the opinion.

*Baker, Baker and Cornish,* for the plaintiffs.

*Clay and Clay,* for the defendants.

VIRGIN, J. Assumpsit for an alleged breach of a contract whereby the defendants were to purchase of the plaintiff company five hundred tons of ice, at five dollars per ton, to be shipped from the Oakland ice houses, in Pittston, "in the month of August, 1880, when the Oakland company are shipping ice."

The report discloses that one Rich was the president and business manager of the plaintiff company and owned ice houses at Farmingdale, some five or six miles above the plaintiffs', on the Kennebec river. The Oakland houses were not open in the month of August, 1880; and the plaintiffs contended that the reason was on account of a waiver, on the part of the defendants, as to the time and place of the delivery of the ice. That not wishing to open the Oakland houses simply to take out a single cargo, the plaintiffs, about August 25, proposed to Maxcy that if they wanted the ice during the month of August, it would be shipped at Rich's houses, in Farmingdale, where he was then shipping; or, if they insisted on having it from the Oakland houses, it should be shipped at them. That to the former alternative, Maxcy, one of the defendants and representing them, assented, with an understanding between the parties, that, as the defendants had thereby accommodated the plaintiffs as to the place, the latter should reciprocate as to the time of delivery, and hold the ice until it should be wanted. That all the ice was thereafter disposed of in the Oakland houses and five hundred tons held for the defendants in the Farmingdale.

The case is before us on motion and exceptions.

I. Rich's testimony as to a conversation relating to the change of the place of delivery, had with Maxcy after the execution and

delivery of the written contract, but before they separated, was clearly admissible. *Goss* v. *Lord Nugent*, 5 Barn. and Adol. 58; *Marshall* v. *Baker,* 19 Maine, 402; *Adams* v. *McFarlane*, 65 Maine, 143, 152, and cases cited there.

II. So was his testimony as to the message sent by him through Davenport to Maxcy. If he could deliver the message himself directly to Maxcy, he could send it by an agent duly authorized. To be sure, the message must be shown to have been communicated to the other party. But the order in which these facts shall be marshaled is subject to the discretion of the court.

III. So was his testimony as to a conversation he had with Maxcy, while the contract was being written, relating to the time of delivery to be inserted in the contract. If the defendant had desired to keep that conversation out, he should not have drawn out a portion of it in cross-examination, and thereby withdraw objections to the remainder of it. *Williams* v. *Gilman*, 71 Maine, 21.

IV. We can conceive no legal objection to the admissibility of Rich's testimony as to the length of time required to open the Oakland houses in August; and the defendants suggest none. Moreover the next succeeding testimony of the same witness covers the same facts, and it was not objected to.

V and VII. The instruction relating to waiver, is not questioned as to its legal quality; and it cannot be properly. *Adams* v. *McFarlane, supra*. But it is challenged upon the alleged ground that there was no testimony calling for it. If we looked only at the testimony introduced by the defendants we might conclude that the objection was well taken; but the plaintiffs' whole case is founded upon an alleged waiver as to the stipulated place of delivery; and there is an abundance of testimony from Rich and Davenport, coupled with the non-denials and non-action of the defendants to call for the instruction. Otherwise this testimony would have been kept from the jury.

VI. Nor is the instruction relating to the duty of the defendants to notify the plaintiffs when they were ready to receive the ice, questioned as a matter of law; but it is contended that it should not have been given in this case, for the reason that one

of the defendants' witnesses, testified that the plaintiffs said they should not open the Oakland houses in August. If that were an undisputed fact, perhaps the law would not have required the useless ceremony on the part of the defendants. But that statement was stoutly denied by the plaintiffs, and the presiding justice could not pass upon that question of fact.

VIII. The eighth exception seems to have been abandoned.

IX. The instruction at the close of the charge given at the request of the plaintiffs, furnishes no ground for exception on the part of the defendants.

X. The first requested instruction was rightfully refused. Appropriate instructions were given in connection with the custom as proved.

XI. The second request was fully covered by the charge.

XII. The third request was properly refused. Rich had the entire charge of the plaintiffs' business and Maxcy testifies that he knew it; and that when he (Maxcy) spoke to Davenport and asked him "when they were going to open the Oakland houses," and that the defendants "were ready to take it (ice) any time they opened in August." Davenport answered that "he did not know that Mr. Rich had charge of it." Maxcy also testified that he never made any such inquiry of Rich. The judge had fully explained all the necessary steps to be taken by the parties under the various phases of the testimony, and upon a careful reading of the entire charge of the learned judge, we fail to perceive how either party could be aggrieved by anything therein.

Motion. The testimony was very conflicting, coming almost entirely from interested parties or persons. The ice market began to fall in the fore part of August, and perhaps the jury could perceive the influence of that fact upon the testimony of the defendants. At any rate the verdict is founded upon sufficient testimony if true.

*Motion and exceptions overruled.*

APPLETON, C. J., WALTON, BARROWS, DANFORTH and PETERS JJ., concurred.